FILED
2024 Sep-27  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **THE CITY OF IRONDALE, ALABAMA,**<br><br>      Plaintiff,<br><br>   v.<br><br>**3M COMPANY, INC.; DAIKIN AMERICA; E.I. DUPONT DE NEMOURS AND COMPANY; DUPONT DE NEMOURS, INC.; CORTEVA, INC.; EIDP, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC LLC; SCHOLAR CRAFT PRODUCTS, INC.; TRICON WEAR SOLUTIONS LLC; and GCP APPLIED TECHNOLOGIES, INC.,**<br><br>      Defendants. | CASE NO. _____<br><br>JURY TRIAL DEMANDED |

## NOTICE OF REMOVAL

Defendant 3M Company ("3M"), by and through undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1), and 1446, from the Circuit Court of Jefferson County, Alabama, to the United States District Court for the Northern District of Alabama, Southern Division. 3M is entitled to remove this case based on federal officer jurisdiction. As grounds for removal, 3M alleges as follows on personal knowledge as to its own conduct and status and on information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.     Plaintiff City of Irondale ("Plaintiff") seeks to hold 3M and other Defendants liable based on their alleged conduct in manufacturing, using, discharging, and/or disposing of per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), and PFAS-containing products. The Complaint alleges that Plaintiff's drinking water supply, consisting of four groundwater wells located along the Banger and Fort Payne Aquifers, has been contaminated by PFAS releases from manufacturing plants located in Irondale and nearby Birmingham.

2.     The alleged PFAS contamination of Plaintiff's drinking water supply potentially resulted at least in part from the use, storage, and/or disposal of PFAS-containing aqueous film-forming foams ("AFFF") that 3M and others developed and sold to the U.S. military in accordance with rigorous military specifications ("MilSpec") issued by the Department of Defense ("DoD"). AFFF is a firefighting foam used for firefighting and fire training. Given the allegations in Plaintiff's Complaint here, the purported PFAS contamination of the groundwater from which Plaintiff's wells draw the town's drinking water just as plausibly resulted (at least in part) from AFFF use at the Air National Guard Base (the "Birmingham ANGB") at the Birmingham-Shuttlesworth International Airport, which is located only a few miles from manufacturing facilities Plaintiff identifies as the source of PFAS in its

groundwater, and in fact is located *between* at least one of those facilities and Irondale's groundwater wells. Upon information and belief, 3M MilSpec AFFF was used at the Birmingham ANGB. Because the alleged PFAS contamination of Plaintiff's water supply just as plausibly resulted from the use, storage, and/or disposal of MilSpec AFFF at the Birmingham ANGB as from non-AFFF PFAS sources identified in Plaintiff's Complaint, 3M intends to assert in this action the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), which bars Plaintiff from establishing, among other things, liability for the design and manufacture of MilSpec AFFF and for the provision of warnings for the product.

3.    Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action to have its federal defense adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008). Courts have held that AFFF manufacturers properly removed cases to federal court on the ground that the plaintiffs' claims plausibly arose at least in part from MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard*, 2021 WL 744683, at *3-4 (W.D. Mich. Jan. 6, 2021); *In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2-3 (D.S.C. May 24, 2019).

4.     Although Plaintiff seemingly purports to disclaim damages related to AFFF, *see* Complaint ¶ 18-19, nevertheless Plaintiff's claims encompass damages attributable to PFAS-containing MilSpec AFFF. Given the allegations in Plaintiff's Complaint, PFAS from MilSpec AFFF use potentially has commingled with PFAS from non-AFFF sources in the groundwater, so the alleged contamination just as plausibly resulted from PFAS-containing MilSpec AFFF as from non-AFFF PFAS sources. MilSpec AFFF has contained PFOS and PFOA, the same PFAS chemicals for which the Complaint seeks to recover here, and Plaintiff has not explained how to segregate out PFAS covered by Plaintiff's purported disclaimer. Moreover, Plaintiff cannot prevent 3M "from raising the production of MilSpec AFFF as a defense or an alternate theory" of Plaintiff's damages. *Nessel*, 2021 WL 744683, at *3. As a result, 3M is entitled to a federal forum to litigate its federal defense.

## **BACKGROUND**

5.     This action was filed on August 23, 2024, in the Circuit Court of Jefferson County, Alabama, bearing Case No. 01-CV-2024-903343.00, against Defendants 3M; Daikin America, Inc.; E.I. DuPont De Nemours and Co.; DuPont De Nemours, Inc.; Corteva, Inc.; EIDP, Inc.; The Chemours Company; The Chemours Company FC, LLC; Scholar Craft Products, Inc.; Tricon Wear Solutions LLC; and GCP Applied Technologies, Inc. The Summons and Complaint are attached hereto as Exhibit A.

6.      Plaintiff alleges that one of its departments, the Irondale Water System, provides drinking water to citizens of Irondale and to surrounding water customers outside the Irondale city limits. Compl. ¶ 24. Plaintiff alleges that it owns and operates multiple wells—Wells 2, 5, 6, and 7—that draw water from the Banger and Fort Payne Aquifers. *Id*. at ¶¶ 24, 97-101. Plaintiff further alleges that its water supply is purportedly contaminated with PFAS in excess of regulatory limits as a result of PFAS that was released from manufacturing facilities and entered the groundwater. *Id*. at ¶¶ 105, 108. According to Plaintiff, PFAS allegedly was discharged from manufacturing facilities now owned by Scholar Craft located in Irondale and Birmingham and from two Tricon facilities located in Irondale. *Id*. at ¶¶ 43, 49. Plaintiff alleges that the manufacturing facilities were "above and/or adjacent to the groundwater source(s) where Plaintiff collects its drinking water." *Id*. at ¶ 51. The Complaint alleges that 3M and certain other Defendants allegedly sold "PFAS, and products that contain or degrade into PFAS" that were used at the manufacturing facilities, that these products were "subsequently discharged both directly and indirectly into the environment and surrounding areas from where Plaintiff collects its drinking water in Jefferson County, Alabama," that such "discharges of PFAS have infiltrated the groundwater where Plaintiff obtains its drinking water," and that "[a]s a direct result, Plaintiff's water supply has been contaminated." *Id*. at ¶ 40.

7.     Plaintiff specifically asserts that its drinking water supply is purportedly contaminated with PFOS and PFOA. *Id*. at ¶ 109. PFOA and PFOS are particular PFAS chemicals that have been used in manufacturing AFFF products, including MilSpec AFFF. *See, e.g.*, *In re: AFFF Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1392, 1394 (J.P.M.L. 2018).

8.     Among other relief, Plaintiff seeks damages to compensate for removing PFAS from its water supply, and an injunction requiring Defendants to remove PFAS from the water supply. Compl. at p. 26. Plaintiff asserts claims against all Defendants, including 3M, for negligence (*id.* ¶¶ 113-116), public nuisance (*id.* ¶¶ 117-121), private nuisance (*id.* ¶¶ 122-125), trespass (*id.* ¶¶ 126-132), and wantonness and punitive damages (*id.* ¶¶ 133-138).

9.     Although Plaintiff seeks to recover for PFAS in its water supply, the Complaint alleges that Plaintiff "makes no claim that the manufacture or use of AFFF in any way caused or contributed to its damages or the claims asserted in this lawsuit." *Id*. at ¶ 18. Plaintiff states that it "expressly disclaims any cause of action or damages associated with AFFF manufacture, sale, use, or disposal by the named Defendants, or by any unnamed defendants or entity, including any legal or factual claim based on alleged 'MilSpec AFFF' as well as any potential claims arguably arising from any federal enclaves." *Id*. at ¶ 19.

## THE PROCEDURAL REQUIREMENTS FOR
## REMOVAL UNDER 28 U.S.C. §§ 1442 AND 1446 ARE MET

10.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 81(c)(1) and 1442(a) because the Circuit Court of Jefferson County, Alabama, is located in the Northern District of Alabama, Southern Division.

11.    3M is not required to notify or obtain the consent of any other Defendant to remove this action as a whole under § 1442(a)(1). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Fed. Home Loan Mortg. Corp. v. Crittenden*, 2012 WL 3023264, at *2 (M.D. Ala. June 14, 2012).

12.    Pursuant to 28 U.S.C. § 1446(a), 3M has attached a true and accurate copy of the Summons and Complaint as Exhibit A and has collectively attached as Exhibit B true and accurate copies of all other documents on file in this case in the Circuit Court of Jefferson County, Alabama.

13.    3M was served with the Summons and Complaint on August 30, 2024. Removal is timely under 28 U.S.C. § 1446(b).

14.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon all parties to this action, and a copy is being filed with the Clerk of the Circuit Court of Jefferson County, Alabama.

15.    By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to service of process, the sufficiency of process,

jurisdiction over the person, or venue; and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

16.    3M reserves the right to amend or supplement this Notice of Removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(A)(1)

17.    Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its acts taken pursuant to a federal officer's directions, have a causal nexus with the plaintiff's claims or injuries or are otherwise related to the action; and (d) it can assert a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124-125, 129-131, 133-135 (1989); *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016).

18.    Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This

is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252. To the contrary, § 1442 must be "liberally construed" in favor of removal. *Watson v. Philip Morris Co., Inc.*, 51 U.S. 142, 147 (2007).

19.    All requirements for removal under § 1442(a)(1) are satisfied where the notice of removal alleges that the plaintiff's alleged injuries plausibly were at least in part caused by and/or related to manufacture of MilSpec AFFF. *See, e.g.*, *Ayo v. 3M Co.*, 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against 3M and other manufacturers of MilSpec AFFF). Federal courts have reached that determination even when plaintiffs purported to disclaim MilSpec AFFF-related injuries. *See, e.g.*, *Nessel*, 2021 WL 744683, at *3 (denying motion to remand in AFFF case against 3M and other manufacturers and holding that, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF[,] . . . . Plaintiffs cannot decide what defense Defendants might present"). This case is properly removed to this Court.

A.    **MilSpec AFFF**

20.    Since the late 1960s/early 1970s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the United States Naval Research Laboratory developed AFFF—its researchers were granted an AFFF-related patent in 1966.[1] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[2]

21.    The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command. The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[3] All MilSpec AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[4] Prior to such listing, a "manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[5] The

---

[1] *See* U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[2] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[3] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[4] MIL-PRF-24385F(4) § 3.1 (2020).

[5] DOD, SD-6, Provisions Governing Qualification at 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[6] After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[7] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[8]

22.    From its inception until 2019, the MilSpec for AFFF included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their precursors—among the compounds expressly alleged to be at issue in the Complaint here.[9] The current MilSpec expressly contemplates the presence of PFOA

---

[6] *See, e.g.*, MIL-PRF-24385F(4) at 18 (2020). The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity." The "Preparing Activity" is responsible for qualification. (*See* DOD SD-6, *supra* note 5, at 3.)

[7] DOD, SD-6, *supra* note 5, at 1.

[8] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[9] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

and PFOS (subject to recently imposed limits) in AFFF formulations.[10] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS from AFFF "while still meeting all other military specification requirements."[11]

23.    3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more AFFF products manufactured by 3M were on the Navy's Qualified Products List for MilSpec AFFF from 1970 until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[12] The U.S. military used MilSpec AFFF manufactured by 3M throughout the United States.

24.    Plaintiff seeks to hold 3M liable for alleged PFOA and PFOS contamination of its groundwater sources but does not attribute that alleged contamination to MilSpec AFFF use—instead, the alleged contamination purportedly resulted from PFAS discharges from manufacturing facilities in Irondale and Birmingham that 3M (and other Defendants) allegedly supplied with PFAS chemicals. Compl. ¶¶ 42, 49, 51. But given the Complaint's allegations attributing

---

[10] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[11] *Id.* § 6.6.

[12] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014); MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (both available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

the alleged contamination to discharges of PFAS from the Scholar Craft Birmingham plant, the alleged PFOA and PFOS contamination equally as plausibly resulted, at least in part, from MilSpec AFFF use—including from known MilSpec AFFF releases at the Birmingham ANGB, which is located less than four miles from the Scholar Craft Birmingham plant, over the same aquifer from which Plaintiff draws its drinking water, and is situated *between* the Birmingham plant and Irondale.

25.     Southern Jefferson County, including Birmingham and Irondale, is located in the Valley and Ridge groundwater province. The aquifers in that province are characterized by many fractures which, according to the Geological Survey of Alabama, "increases the potential for contaminant movement in all areas of the province."[13]

26.     At a minimum, it is at least as plausible that MilSpec AFFF use at Birmingham ANGB, which lies between the Birmingham facility named in Plaintiff's complaint and the City's intake wells, contributed to the alleged PFOS and PFOA contamination of Plaintiff's water supply as did PFAS releases at the Scholar Craft Birmingham plant.

27.     Moreover, the City of Birmingham itself has filed a lawsuit in the *In re AFFF Products Liability Litigation* MDL, pending in the U.S. District Court for the

---

[13] Geological Survey of Alabama, Bulletin 192, *An Aquifer Recharge Potential Model for Alabama* at 8 (2022), available at: https://gsa.state.al.us/Scripts/GSAOGB/gsa/groundwater/GSA_B192.pdf

District of South Carolina, against 3M and other Defendants to recover specifically for alleged PFAS contamination of the City's property resulting from AFFF use at the Birmingham ANGB. Compl. ¶ 9, *City of Birmingham, Alabama v. 3M Company, et al.*, No. 2:21-cv-606-RMG (D.S.C.), ECF No. 1. The City of Birmingham alleges (*id.*, ¶ 10) that "[a] 2019 report by the United States Department of Defense found City owned property at the Birmingham-Shuttlesworth Airport to be highly contaminated with PFOS, PFOA, and other PFAS compounds," and that "[t]he Department of Defense lists the Birmingham Airport as having one of the highest levels of contamination at U.S. Military Installations."

28.     PFAS from MilSpec AFFF manufactured by 3M therefore potentially has commingled with PFAS from non-AFFF sources in the groundwater, so that Plaintiff's effort to recover for alleged PFOS and PFOA contamination of the groundwater provides a basis for 3M to assert its federal government contractor defense. Plaintiff alleges PFAS contamination from non-AFFF sources, but it is just as plausible that Plaintiff's claims to recover for such contamination arise at least in part, from manufacture and/or use of MilSpec products that were required by DoD to contain PFAS. Thus, 3M is entitled to remove this case as a whole under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). "It is entirely possible that Plaintiff['s] injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF." *Nessel*, 2021 WL 744683, at *3.

14

3M is entitled to raise "the production of MilSpec AFFF as a defense or alternative theory." *Id*. As shown below, the elements of federal officer jurisdiction are met when a plaintiff asserts claims based on alleged contamination that may be at least in part caused by and/or related to MilSpec products.

29.     Although Plaintiff allegedly is not seeking any damages from or asserting any claims relating to MilSpec AFFF, Compl. ¶ 19, federal officer removal is proper notwithstanding Plaintiff's seeming disclaimer because the claimed injury from PFAS is just as plausibly due in part to MilSpec AFFF as it is to the non-AFFF PFAS sources identified in Plaintiff's own Complaint. *See Raoul v. 3M Co.*, 111 F.4th 846, 849 (7th Cir. 2024) (holding that federal officer removal would be appropriate notwithstanding State's disclaimer of liability related to AFFF "if even a morsel of contamination" alleged in complaint was from AFFF); *Nessel*, 2021 WL 744683, at *3 (denying State of Michigan's motion to remand and concluding that federal officer removal was proper notwithstanding the complaint's allegation that Michigan was not seeking relief for MilSpec AFFF; "Plaintiffs' artful pleading does not obviate the facts on the ground.").

**B.    All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

### *1. The "Person" Requirement Is Satisfied*

30.     The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) is a "person" under the statute.

For purposes of § 1442(a)(1), the term "person" includes "corporations, companies, associations, firms, [and] partnerships." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1); *accord Isaacson*, 517 F.3d at 135–36.

### *2. The "Acting Under" Requirement Is Satisfied*

31.    The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer.  *Papp*, 842 F.3d at 812. "The words 'acting under' are to be interpreted broadly."  *Isaacson*, 517 F.3d at 136 (citation omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813. Rather, "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017).

32.    The requirement of "acting under" federal office is met here because the alleged PFAS contamination of Plaintiff's drinking water from putative non-AFFF PFAS sources just as plausibly stems in part from 3M's manufacture of MilSpec AFFF, a vital product that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137; *see also Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "lifesaving product" used by

16

all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations" and that 3M "contributed considerably to the success of the development of AFFF."[14] Thus, the military has long depended upon outside contractors like 3M to develop and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *accord In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2; *Ayo*, 2018 WL 4781145, at *8-9.

33.    In designing, manufacturing, and supplying MilSpec AFFF, 3M acted under the direction and control of one or more federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, which govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, MilSpec AFFF products were subject to various tests by the United States Navy before and after being approved for use

---

[14] Fulfilling the Roosevelts' Vision, *supra* n.2, at 37.

by the military and for inclusion on the Qualified Products List maintained by the DoD.[15]

### *3. The "Under Color Of Federal Office" Requirement Is Satisfied*

34.    The third requirement, that the defendant's actions were taken "under color of federal office," requires a "nexus" between the plaintiff's claims or injuries and the defendant's acts undertaken at the direction of a federal officer. As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137.[16] It is sufficient for a defendant to establish a connection or association between the lawsuit and the federal office. *See Sawyer*, 860 F.3d at 258 (explaining that 28 U.S.C. § 1442 permits removal of actions "for *or relating to* any act under color of [federal] office"); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35-36 (1st Cir. 2022); *Papp*, 842 F.3d at 813; *see also Isaacson*, 517 F.3d at 137-38 (holding that it is sufficient if the act that allegedly caused or contributed to the plaintiff's injury occurred while the defendant was performing its official duties).

35.    Courts "credit Defendants' theory of the case" when determining whether the requisite connection exists. *Isaacson*, 517 F.3d at 137. Here, Plaintiff's claims in this case for purported contamination from non-AFFF PFAS sources just

---

[15] *See* Dep't of Defense, SD-6, *supra* n.5, at 1.

[16] The "acting under" and "under color of" prongs overlap.  Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction."  *Albrecht*, 2011 WL 5109532, at *5.

as plausibly arise at least in part from 3M's manufacture of products for which the applicable MilSpec required the use of PFAS to meet the Government's needs. As a result, Plaintiff's claims against 3M are "for or relating to" 3M's acts taken under color of federal office. 28 U.S.C. § 1442(a)(1).

### 4. The "Colorable Federal Defense" Requirement Is Satisfied

36.    The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion of the government contractor defense.

37.    At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original). "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court."). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116.[17] Moreover, "this inquiry is undertaken whilst

---

[17] *See also Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the

viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original).

38.    Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

39.    3M has satisfied these elements for purposes of removal. The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of

---

defense' at this stage.  Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.").

MilSpec AFFF, and its role was not a mere "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling. Those specifications are "reasonably precise," including in requiring the use of PFAS. In addition, in the past and continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

40.     With respect to the second requirement, 3M's products have appeared on the DoD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("There is also colorable evidence … that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); *In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

41.    Regarding the third requirement, the government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[18] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[19] In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[20] By no later

---

[18] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002) (excerpt).

[19] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[20] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent." In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer. More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[21] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[22] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); *In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at

---

[21] Dep't of Defense, *Aqueous Film Forming Foam Report to Congress* 1-2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[22] *See* MIL-PRF-24385F(SH), Amendment 4, § 6.6 & Tables I, III (2020), https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

*3 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . ").

42.    At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See Twinam v. Dow Chem. Co.* (*In re "Agent Orange" Prod. Liab. Litig.*), 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

43.    3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries to Plaintiff that were caused in whole or in part by 3M's compliance with military specifications, Plaintiff is attempting to use state tort law to attack design choices

dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

44.    In the MDL, the court has found based on an extensive factual record that the government contractor defense asserted by 3M and other defendants presents genuine issues of fact for trial. *See In re AFFF Prods. Liab. Litig.*, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues is by definition better than merely "colorable."

45.    Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

* * * * *

WHEREFORE, 3M hereby removes this action from the Circuit Court of Jefferson County, Alabama, to this Court.

DATED: September 27, 2024

/s/ W. Larkin Radney, IV
One of the Attorneys for
Defendant 3M Company

OF COUNSEL:

M. Christian King
Harlan I. Prater, IV
W. Larkin Radney, IV
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, AL 35203-3200
(205) 581-0700
cking@lightfootlaw.com
hprater@lightfootlaw.com
lradney@lightfootlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2024, a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send electronic notice of such filing to all counsel of record, and that a copy was served via U.S. Mail and/or Email to the following:

**By U.S. Mail and CM/ECF Email:**

Matt Conn
Lee Patterson
Madison Gitschier
Ethan Wright
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL  35242
(205) 278-7000
mconn@friedman-lawyers.com
lpatterson@friedman-lawyers.com
mgitschier@friedman-lawyers.com
ewright@friedman-lawyers.com

April B. Danielson
Kimberly R. West
Lauren C. Brasher
Wallace Jordan
Synovus Center
800 Shades Creek Parkway, Suite 400
Birmingham, AL  35209
(205) 870-0555
adanielson@wallacejordan.com
kwest@wallacejordan.com
lbrasher@wallacejordan.com

**By U.S. Mail:**

DAIKIN AMERICA, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

E.I. DUPONT DE NEMOURS AND COMPANY
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

DUPONT DE NEMOURS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

CORTEVA, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

EIDP, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

THE CHEMOURS COMPANY
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

THE CHEMOURS COMPANY FC, LLC
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

SCHOLAR CRAFT PRODUCTS, INC.
c/o Kenneth Goode
#1 Scholar Craft Parkway
Birmingham, AL 35217

TRICON WEAR SOLUTIONS LLC
c/o Corporation Service Company, Inc.
641 South Lawrence Street
Montgomery, AL 36104

GCP APPLIED TECHNOLOGIES, INC.
c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

/s/ W. Larkin Radney, IV
One of the Attorneys for
Defendant 3M Company