## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **THE CITY OF IRONDALE, ALABAMA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:24-cv-01327-AMM** |
| | ) | |
| **3M COMPANY, INC., *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

This case is before the court on a motion to remand by plaintiff the City of Irondale, Alabama ("Irondale"), Doc. 3, and a motion to strike by defendant 3M Company, Inc. ("3M"), Doc. 27. For the reasons explained below, the motion to remand is **DENIED**; the motion to strike is **DENIED**; the pending motion to stay consideration of the motion to remand and motion for an expedited hearing, Docs. 37–38, are **DENIED AS MOOT**; and the pending motions to dismiss, Docs. 12, 16, are **DENIED WITHOUT PREJUDICE** with leave to refile at the appropriate time.

## I.    BACKGROUND

Irondale filed a complaint in the Circuit Court of Jefferson County against 3M, Scholar Craft Products, Inc. ("Scholar Craft"), and several other defendants on August 23, 2024. *See* Doc. 1-1 at 8–12, ¶¶ 29–52.

In the operative complaint, Irondale alleges that certain manufacturers of per- and polyfluoroalkyl substances ("PFAS"), such as 3M, "created and sold these chemicals to industries throughout the State of Alabama, with full knowledge of their products' pernicious effects and likelihood of causing pollution to [Irondale's] water supply." *Id.* at 3–4, ¶ 8. Irondale also alleges that certain PFAS commercial users, such as Scholar Craft, "purchased and used PFAS and products containing or degrading into PFAS in their industrial processes" and "have continuously caused and permitted PFAS-contaminated waste to be discharged into the environment and surrounding areas from where [Irondale] collects its drinking water." *Id.* at 4, 10–11 ¶¶ 9, 43. According to Irondale, these users "do not have authorization to discharge PFAS, and they knew or should have known that their use and discharge of PFAS would pollute [Irondale]'s water and cause [Irondale] injury." *Id.* at 4, ¶ 9.

Irondale alleges that such pollution is pernicious because, despite its commercially valuable abilities to "repel [liquid] and resist staining," "PFAS are known by the Environmental Protection Agency ('EPA') and industrial users to be persistent in the environment, bio-accumulative in humans and animals, and toxic (referred to in the chemical industry as 'PBT')." *Id.* at 3, ¶¶ 2–3. Accordingly, "PFAS are commonly referred to as 'forever chemicals.'" *Id.* at 3, ¶ 4. Irondale alleges that "[c]onventional drinking water systems are incapable of removing these 'forever chemicals' from water. As a result, PFAS pass through conventional

drinking water systems into the environment and eventually the bloodstreams of the general public." *Id.* at 3, ¶ 5. According to Irondale, this is problematic because "[t]he current scientific consensus is that there is no safe level of PFAS in drinking water," and "[t]he EPA has found that PFAS are likely to cause an array of adverse health and environmental effects, including but not limited to, low birth weight in children, miscarriage, and cancer." *Id.* at 3, ¶ 6.

Irondale alleges that "the [d]efendants have jointly and continuously caused [PFAS] to enter [its] drinking water." *Id.* at 4, ¶ 11. As a result, "[Irondale] must find a way to remove these harmful chemicals from its water in order to meet its obligations as public water providers, comply with federal regulations and guidelines, and most importantly, protect human health and the environment." *Id.* at 4, ¶ 12. This will require Irondale "to upgrade to costly and sophisticated new treatment technologies in order to remove [d]efendants' PFAS from its drinking water," because "like most public water systems, [it] does not have the treatment technology necessary to remove PFAS from raw water." *Id.* at 4, ¶ 13.

Irondale seeks compensatory damages, punitive damages, and "an injunction requiring [d]efendants to abate their nuisance and/or otherwise remove their chemicals from [Irondale]'s water supply and to prevent these chemicals from continuing to contaminate [Irondale]'s water supply." *Id.* at 27.

3

Irondale makes clear throughout its complaint that "[t]his case does not arise out of the use or discharge of Aqueous Film-Forming Foam ('AFFF')[1] or any products used by, supplied to, or manufactured to the specifications of the federal government ["MilSpec"]." *See, e.g.*, *id.* at 2–3, ¶ 1. Irondale even went as far as to include a section in its complaint entitled "**DISCLAIMER**" wherein it stated: "[Irondale] makes no claim that the manufacture or use of AFFF in any way caused or contributed to its damages or the claims asserted in this lawsuit," and that it "expressly disclaims any cause of action or damages arising from or associated with AFFF manufacture, sale, use or disposal by the named [d]efendants . . . including any legal or factual claim based on alleged 'MilSpec AFFF' as well as any potential claims arguably arising from any federal enclaves." *Id.* at 5–6, ¶¶ 18–19 (emphasis in original). As might already be apparent, this issue sits at the heart of the parties' current dispute.

3M removed the case to this court on September 27, 2024 under federal officer jurisdiction because "[t]he alleged PFAS contamination of [Irondale]'s drinking water supply potentially resulted at least in part from the use, storage, and/or disposal of PFAS-containing [AFFF] that 3M and others developed and sold to the U.S. military in accordance with rigorous [MilSpec] issued by the Department of Defense

---

[1] AFFF is a PFAS-containing "firefighting foam used for firefighting and fire training." Doc. 1 at 2, ¶ 2 (3M notice of removal).

('DoD')," and accordingly, 3M plans to assert a federal contractor defense. Doc. 1 at 1–3. Irondale moved to remand the case to state court. Doc. 3. That motion is fully briefed, Docs. 4, 26, 28, 36, inclusive of supplemental notices of authority, Docs. 47–49.

## II. LEGAL STANDARD

"The federal-officer removal statute protects an officer of the United States from having to answer for his official conduct in a state court." *Georgia v. Meadows*, 88 F.4th 1331, 1338 (11th Cir. 2023) (citing 28 U.S.C. § 1442(a)(1)). To that end, the statute allows for the removal of certain civil and criminal actions to federal court:

> A civil action or criminal prosecution that is commenced in a State court . . . may be removed . . . to the district court of the United States for the district and division embracing the place wherein it is pending [if it] is against or directed to . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1).

Ordinarily, "[a] removing defendant bears the burden of proving proper federal jurisdiction," and "[a]ny doubts about the propriety of federal jurisdiction should be resolved in favor of remand to state court." *Adventure Outdoors, Inc. v.*

*Bloomberg*, 552 F.3d 1290, 1294 (11th Cir. 2008) (cleaned up). But that rule does not apply to the federal officer removal statute, because the Supreme "Court has made clear that the statute must be 'liberally construed.'" *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 147 (2007) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *accord Willingham v. Morgan*, 395 U.S. 402, 407 (1969) ("Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum. This policy should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).").

## III.    ANALYSIS

3M removed this case under the federal officer removal statute. Doc. 1 at 7–8; 28 U.S.C. §§ 1442, 1446. 3M argues that "the purported PFAS contamination of the groundwater from which [Irondale]'s wells draw the town's drinking water just as plausibly resulted (at least in part) from AFFF use at the Air National Guard Base (the 'Birmingham ANGB') at the Birmingham-Shuttlesworth International Airport," because the Birmingham ANGB "is located only a few miles from manufacturing facilities [Irondale] identifies as the source of PFAS in its groundwater, and in fact is located *between* at least one of those facilities and Irondale's groundwater wells." Doc. 1 at 2–3. In turn, "3M intends to assert in this action the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), which bars [Irondale] from establishing, among other things, liability for the

design and manufacture of MilSpec AFFF and for the provision of warnings for the product." Doc. 1 at 3.

Irondale argues that the case should be remanded because (1) "3M's argument [on federal officer removal] is based on a false factual assumption and/or interpretation of [Irondale]'s Complaint," and (2) Irondale's express disclaimer of MilSpec AFFF related damages supports remand. Doc. 3 at 2, 4–5, ¶¶ 4, 9.

Section 1442(a)(1) contemplates several categories of removing defendants, including federal officers and those "acting under" a federal officer. *See* 28 U.S.C. § 1442(a)(1). As to federal officers, "Section 1442(a)(1) provides a right of removal to federal court if a defendant proves that he is a federal officer, his conduct underlying the suit was performed under color of federal office, and he has a 'colorable' federal defense." *Meadows*, 88 F.4th at 1338 (citing *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017)). The test for those "acting under" a federal officer differs. A private defendant may remove a case to federal court under section 1442(a)(1) by showing: (1) "it is a person . . . who acted under a federal officer"; (2) "it performed the actions for which it is being sued under color of federal office"; and (3) it has "a colorable federal defense." *Caver*, 845 F.3d at 1142; *Schleider v. GVDB Operations, LLC*, 121 F.4th 149, 158 (11th Cir. 2024) (stating the same); *see also Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427–29 (11th

Cir. 1996). "The defendant bears the burden of proof, . . . but that bar is 'quite low.'"

*Meadows*, 88 F.4th at 1338 (quoting *Caver*, 845 F.3d at 1144).

## A.    Whether 3M Was "Acting Under" a Federal Officer

3M satisfies the first element of the federal officer removal jurisdictional inquiry. There is no dispute that 3M is a "person" within the meaning of the federal officer removal statute. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (holding that a corporation "is in legal fact a person" for purposes of federal officer removal purposes); 1 U.S.C. § 1 (the word "person" "include[s] corporations," "unless the context indicates otherwise").

The parties dispute whether 3M "acted under" a federal officer. "To 'act under' a federal officer, the relevant act 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Schleider*, 121 F.4th at 158 (quoting *Watson*, 551 U.S. at 152) (cleaned-up). "In other words, the private person must help federal officers fulfill a basic governmental task that the government otherwise would have had to perform." *Id.* (quoting *Caver*, 845 F.3d at 1143). "And 'the relationship between the private person and the federal officer must be one of subjection, guidance, or control.'" *Id.* (quoting *Watson*, 551 U.S. at 151).

3M contends that "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." Doc. 26 at 14

8

(quoting *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017)). 3M alleged in its notice of removal that "3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, which govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling." Doc. 1 ¶ 33. And "MilSpec AFFF products were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the [Department of Defense]." *Id.*

Several other federal courts have accepted this argument when ruling on motions to remand. *See, e.g.*, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-MN-2873-RMG, 2019 WL 2807266, at *2 (D.S.C. May 24, 2019) ("Because the U.S. military accepts and tests AFFF products against military specifications ('MilSpec') promulgated by Naval Sea Systems Command . . . [the removing defendant] has demonstrated that it was manufacturing the product under the U.S. military's guidance."); *Nessel v. Chemguard, Inc.*, No. 1:20-CV-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (finding that because the removing defendants "were producing MilSpec AFFF," which "is a product that the Government would have had to create if [the removing] Defendants did not exist," they "satisfied the 'acting under' requirement of § 1442(a)(1).").

In rebuttal, Irondale argues that "[w]hile MilSpec AFFF may be on the Navy Qualified List, this federal initiative is a performance-based standard, not a design mandate." Doc. 4 at 32. Thus, Irondale says, "[n]either the military nor the federal government controls the means and the methods of production, and 3M retained wide latitude to manufacture, advertise, and produce MilSpec AFFF," so 3M did not "act[] under the 'subjection, guidance, or control' of the federal government." *Id.* at 26, 29 (quoting *Watson*, 551 U.S. at 143).

Irondale cites the same multidistrict litigation that 3M cites in support of this argument. *Id.* at 30–31 (citing *In re Aqueous*, 2022 WL 4291357). However, as Irondale acknowledges, that case was "at the summary judgment stage in the AFFF litigation" and had followed "years of fact discovery," when the court issued the opinion it cites. *Id.* at 30. In other words, the case was in a different posture and decided on a different record.

Irondale also cites *Meadows* to assert that the "11th Circuit limits federal-officer removal to current—not former—federal officers." Doc. 4 at 34 (citing *Meadows*, 88 F.4th at 1338). Put succinctly, Irondale contends that "3M cannot dispute that *Meadows* limits federal officer removal to 'current' federal officers, and 3M cannot provide a logical explanation for why private contractors would receive more protection under the 'federal officer removal' statute than federal officers themselves." *Id.* at 34–35.

In *Meadows*, the Eleventh Circuit held that former White House Chief of Staff Mark Meadows could not remove his criminal case from Georgia state court because the text of the federal officer removal statute that provides for removal by "any officer . . . of the United States," "does not apply to *former* federal officers." 88 F.4th at 1338. Alternatively, the Eleventh Circuit held that remand was required because the acts alleged in the indictment did not relate to Meadows's official duties. *Id.* at 1343.

The present case differs in two material respects. *First*, this is a civil case. *See Meadows*, 88 F.4th at 1348. As the Eleventh Circuit observed in *Meadows*, "the Supreme Court has explained that, in 'a criminal case, a more detailed showing might be necessary because of the more compelling state interest in conducting criminal trials in the state courts.'" *Id.* (quoting *Willingham*, 395 U.S. at 409 n.4). *Second*, the predicate for removal in this case is different language from Section 1442(a)(1) authorizing removal by "any person acting under" a federal officer, not the statutory language at issue in *Meadows* about officers themselves. *See Georgia v. Kim*, 733 F. Supp. 3d 1378, 1380 (N.D. Ga. 2024) (noting that *Meadows* "does not address" the "acting under" provision and permitting removal of a former federal officer pursuant to the "acting under" provision).

Indeed, several district courts have rejected Irondale's interpretation of *Meadows*. *See, e.g.*, *Kim*, 733 F. Supp. 3d at 1380; *Goffner v. Avondale Indus., Inc.*,

No. 22-3047, 2024 WL 2844542, at *4 (E.D. La. June 5, 2024); *Ditcharo v. Union Pac. R.R. Co.*, No. 23-7399, 2024 WL 1433652, at *2 (E.D. La. Apr. 3, 2024); *Marcella v. Huntington Ingalls Inc.*, No. 24-780, 2024 WL 2814044, at *4 (E.D. La. June 3, 2024).

Given the Supreme Court's command to "liberally construe[]" the federal officer removal statute, *Watson*, 551 U.S. at 147, these distinguishing factors, and the persuasive precedent treating contractors being sued for inquiries arising from equipment made for the government according to government specifications, the court finds that *Meadows* does not apply, and 3M satisfies the "acting under" element of the federal officer removal jurisdictional inquiry.

### B.    Whether 3M Established a Causal Connection

The second element of federal officer removal requires the removing defendant to show "a nexus, a causal connection between the charged conduct and asserted official authority." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999) (cleaned up). That showing does not have to be "airtight," as that would "defeat the purpose of the removal statute." *Id.* at 432. Accordingly, the standard dictates that the court "credit[s]" 3M's theory of the case to the extent it is "an adequate threshold

showing that the suit is," *id.*, "for or relating to any act under color of [federal] office," 28 U.S.C. § 1442(a)(1).[2]

3M's theory of the case, as recited earlier, is that "the purported PFAS contamination of the groundwater from which [Irondale]'s wells draw the town's drinking water just as plausibly resulted (at least in part) from AFFF use at the Air National Guard Base (the 'Birmingham ANGB') at the Birmingham-Shuttlesworth International Airport," because the Birmingham ANGB "is located only a few miles from manufacturing facilities [Irondale] identifies as the source of PFAS in its groundwater, and in fact is located *between* at least one of those facilities and Irondale's groundwater wells." Doc. 1 at 2–3.

Irondale asserts that its complaint identifies two Scholar Craft manufacturing plants (the Irondale and Tarrant Plants), but "only makes allegations related to the Irondale Plant" as to the discharge of PFAS. Doc. 3 ¶ 5. And, importantly, the Tarrant Plant is the only Scholar Craft plant located between Irondale and the Birmingham ANGB. *See* Doc. 4 at 15–16. Thus, Irondale asserts that it is a "misrepresentation" when 3M claims that the Birmingham ANGB "is located between at least one of" the purported PFAS polluter sites. *Id.* (cleaned up). Additionally, Irondale relies on a declaration from Dr. Charles Andrews, a

---

[2] "In 2011, Congress amended § 1442(a)(1) to add the phrase 'or relating to,' which was intended to broaden the scope of acts that allow a federal officer to remove a case to federal court." *Caver*, 845 F.3d at 1144 n.8.

hydrogeologist with decades of experience, to assert that it is "implausible" that PFAS contamination in Irondale's wells stem from any potential pollution at the Birmingham ANGB since "[t]here is no groundwater flow pathway from beneath the base towards [Irondale]'s wells." *Id.* at 16–17 (quoting Doc. 4-1 ¶¶ 8–9).

3M disputes these assertions. *First*, 3M moves to strike Dr. Andrews's declaration on the grounds that it does not meet the requirements of Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because "it does not disclose any methodology used by Mr. Andrews in reaching his opinions, much less a scientifically reliable methodology." Doc. 27 at 3. *Second*, 3M contends that Irondale's charge of misrepresentation "is foreclosed by a plain reading of the Complaint, which alleges that '[t]hrough its manufacture and use of products containing and/or degrading into PFAS, Scholar Craft is *causing* and *contributing*' to [Irondale]'s injury." Doc. 26 at 10 (quoting Doc. 1-1 at 10–11, ¶ 43). *Third*, 3M argues that there are "many fractures" in the groundwater province for Birmingham and Irondale, which "increases the potential for contaminant movement in all areas of the province." *Id.* at 5 (quoting Doc. 1 ¶ 25).

Irondale pushes back on 3M's assertions. *First*, Irondale contends that "Irondale draws its drinking water from the Bangor and Fort Payne Aquifers, . . . whereas the Birmingham ANGB overlays the Knox Aquifer." Doc. 28 at 3. *Second*, Irondale contends that "3M does not even provide any evidence that it supplied any

14

of the AFFF used at the Birmingham ANGB." *Id. Third*, Irondale argues that "[l]egally, it is not plausible that this case is related to Mil-Spec AFFF because Irondale explicitly disclaimed any such theory of recovery." *Id.* at 4.

3M's purported misreading of Irondale's complaint is immaterial to the motion to remand because, at this stage, Irondale "is no longer the master of its complaint." *Maryland v. 3M Co.*, 130 F.4th 380, 389 (4th Cir. 2025). "Instead, we look to [3M]'s well-pleaded facts of removal to see if it is entitled to a federal forum despite the 'nonfederal cast of the complaint.'" *Id.* (quoting *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006)); *see also Acker*, 527 U.S. at 432 ("credit[ing] the [defendants]' theory of the case for purposes of . . . [the] jurisdictional inquiry"). So in this regard, the question before the court is not what Irondale alleged about the flow or connection of any potential PFAS pollution, but rather whether it is *plausible*, as 3M asserts in its notice of removal, that PFAS contamination (in the form of MilSpec AFFF) from the Birmingham ANGB contributed to Irondale's alleged injury. Indeed, such contamination is the "gravamen" or "the heart of the" claim brought by Irondale. *Meadows*, 88 F.4th at 1344.

Irondale's evidence is Dr. Andrews's declaration wherein he states that "it is not plausible that the PFAS contamination in the City of Irondale wells originated from releases of AFFF at the Air National Guard Base" because "[t]here is no

groundwater flow pathway from beneath the base toward [Irondale]'s wells." Doc. 4-1 ¶ 8. 3M's evidence is a 2022 geological survey of Alabama that states that "the presence of fractures throughout the [applicable] province increases the potential for contaminant movement in all areas of the province." Geological Survey of Alabama, Bulletin 192, *An Aquifer Recharge Potential Model for Alabama* at 8 (2022), available                                                                                                                                                                  at: https://gsa.state.al.us/Scripts/GSAOGB/gsa/groundwater/GSA_B192.pdf.          Dr. Andrews's declaration notes that he considered such documents in his analysis, *see* Doc. 4-1 ¶ 5(c), but his declaration is not dispositive, particularly given its level of generality. Even if Dr. Andrews's declaration were more detailed, it would not overcome the reality that 3M has put forth a **plausible** case that MilSpec AFFF is a **potential** source of Irondale's complained-of injury. That is enough for today's purposes, even if it may present a challenge for 3M in later stages of this litigation. As such, 3M satisfies the second element of the federal officer removal jurisdictional inquiry.

### C.    Whether 3M Has a Colorable Federal Defense

Finally, 3M satisfies the third element of the federal officer removal jurisdictional inquiry—whether it has "a colorable federal defense." *Caver*, 845 F.3d at 1142. 3M hinges its federal defense on *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), which it says bars Irondale "from establishing, among other things,

liability for the design and manufacture of MilSpec AFFF and for the provision of warnings for the product." Doc. 1 at 3. The Supreme Court has laid out a three-part test to utilize this affirmative defense:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle*, 487 U.S. at 512. Critically, this "colorable federal 'defense need only be plausible; its ultimate validity is not to be determined at the time of removal.'" *Caver*, 845 F.3d at 1145 (quoting *Magnin*, 91 F.3d at 1427).

3M has plausibly alleged: (1) that the "Naval Sea Systems Command participated in the design of MilSpec AFFF" by "creat[ing] . . . detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling," and that such specifications were "reasonably precise"; (2) that its MilSpec AFFF conformed to those reasonably precise specifications because it "appeared on the D[epartment of Defense] Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that [it] conformed to the MilSpec"; and (3) that the United States military "has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil

and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues." Doc. 1 ¶¶ 39–41.

Irondale contends that its "express disclaimer of AFFF precludes 3M from asserting a 'colorable' federal defense," Doc. 28 at 15, but as discussed below, such a disclaimer does not preclude 3M's affirmative defense because it is plausible that MilSpec AFFF from the Birmingham ANGB at least partially contaminated Irondale's wells. Therefore, 3M has a colorable federal defense, satisfying the third element of the federal officer removal jurisdictional inquiry.

### D.    Irondale's Disclaimer

Irondale asserts that "[w]here there is an express disclaimer of MilSpec AFFF related damages, there can be no federal officer removal, and the case must be remanded to state court." Doc. 4 at 19. According to Irondale, "[t]he gravamen of a disclaimer is that it eliminates the nexus between state court claims and any damages arising from MilSpec AFFF," and here there is "no ambiguity that Irondale is seeking no damages related to MilSpec AFFF." *Id.* at 20–21. Irondale further explains that it "is seeking damages to fund a water treatment facility capable of removing Defendants' PFAS," and that "even if there is some AFFF in Irondale's drinking water, . . . the 'non-AFFF' PFAS in Irondale's drinking water, by itself, necessitates and justifies the damages sought by [Irondale]." Doc. 28 at 22.

3M argues that Irondale's "putative disclaimer does not defeat federal jurisdiction, because even though [Irondale] alleges that [Irondale] disavowed claims based on 3M's acts under color of federal office (3M's manufacture of AFFF), 3M alleges that the use of MilSpec AFFF at Birmingham ANGB is a plausible source of the contamination of [Irondale]'s drinking water supply." Doc. 26 at 28. Put differently, 3M contends that it "can assert its government contractor defense regardless of the alleged disclaimers" and that it "has a right to remove this case to federal court to have its federal defense adjudicated in a federal forum." *Id.* at 28–29.

3M is right. Irondale's "theory ignores the unique lens through which [courts] consider federal officer removal." *Maryland*, 130 F.4th at 389. As previously discussed, the court "look[s] to [3M]'s well-pleaded facts of removal to see if it is entitled to a federal forum despite the 'nonfederal cast of the complaint.'" *Id.* (quoting *Kircher*, 547 U.S. at 644 n.12). Indeed, "the federal-question element is met if the **defense** depends on federal law," *Acker*, 527 U.S. at 431 (emphasis added), and the Eleventh Circuit requires only that the federal defense be "plausible" because "a core purpose of federal officer removal is to have the validity of the federal defense tried in federal court," *Caver*, 845 F.3d at 1145 (cleaned up). Thus, once 3M plausibly alleges a *Boyle* defense, it does not matter whether Irondale specifically seeks MilSpec AFFF-related damages or not. What matters (for present purposes) is

the availability of the federal defense given the context of the case. Here, the record indicates that "a factfinder must . . . still decide the important causation and allocation questions [regarding alleged PFAS contamination]," which "are merits questions that belong in federal court." *Maryland*, 130 F.4th at 392.

Irondale's assurance that it would need to build the same water treatment facility regardless of whether there is mixed PFAS contamination is immaterial on multiple grounds. *First*, Irondale seeks punitive damages. Doc. 1-1 at 27. If there is mixed PFAS contamination, then a factfinder may need to understand the specifics of that mixed contamination to determine the extent of any wanton conduct in awarding punitive damages. *See* Ala. Code. § 6-11-20. And 3M would presumably want to introduce its federal defense to mitigate any potential award of punitive damages. *Second*, Irondale seeks "an injunction requiring [d]efendants to abate their nuisance and/or otherwise remove their chemicals from [Irondale]'s water supply and to prevent these chemicals from continuing to contaminate [Irondale]'s water supply." Doc. 1-1 at 27. "It is axiomatic that '[i]njunctive relief should be limited in scope to the extent necessary to protect the interests of the parties.'" *Garrido v. Dudek*, 731 F.3d 1152, 1159 (11th Cir. 2013) (quoting *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003)). Federal Rule of Civil Procedure 65(d) requires "that every injunction state in specific terms and reasonable detail the conduct that it restrains or requires." *Alley v. U.S. Dep't of Health & Hum. Servs.*,

590 F.3d 1195, 1205 (11th Cir. 2009). If there is mixed PFAS contamination, then the scope of Irondale's requested injunction could force the defendants to remediate PFAS attributable to AFFF, or they could be unable to fully remediate the complained-of contamination due to PFAS emanating from a third party. Under such circumstances, it would be difficult (if not impossible) to both make Irondale whole and craft a valid injunction. *Third*, Irondale's intended purposes for any awarded damages are irrelevant in determining whether the court has jurisdiction under the federal officer removal statute.

For these reasons, Irondale's disclaimer does not preclude federal officer jurisdiction in this case.

## IV.    CONCLUSION

Because 3M satisfies the deferential standard afforded to it for federal officer removal, *see Watson*, 551 U.S. at 147, and Irondale's disclaimer is ineffective to preclude such removal, Irondale's motion to remand is **DENIED**. Additionally, the motion to strike is **DENIED** because the court afforded Dr. Andrews's declaration its appropriate weight, the pending motion to stay consideration of the motion to remand and motion for an expedited hearing, Docs. 37–38, are **DENIED AS MOOT**, and the pending motions to dismiss, Docs. 12, 16, are **DENIED WITHOUT PREJUDICE** with leave to refile at the appropriate time.

21

**DONE** and **ORDERED** this 19th day of August, 2025.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE